262 S.W.2d 584 (1953)
STATE
v.
BRADFORD.
No. 43744.
Supreme Court of Missouri. Division No. 1.
November 9, 1953.
Motion for Rehearing or to Transfer to Denied December 14, 1953.
*585 Harry T. Limerick, Jr., Columbia, for appellant.
John M. Dalton, Atty. Gen., David Donnelly, Asst. Atty. Gen., for respondent.
Motion for Rehearing or to Transfer to Court en Banc Denied December 14, 1953.
VAN OSDOL, Commissioner.
Defendant was convicted of the crime of forcible rape. The information also contained averments under the Habitual Criminal Act. Section 556.280 RSMo 1949, V.A.M.S. The jury apparently disregarded the evidence of former convictions and assessed defendant's punishment at fifty years in the State penitentiary. Defendant has appealed from the ensuing judgment.
The events giving rise to the charge of rape occurred October 29, 1949. It was charged that the defendant had committed the crime upon the body of the prosecutrix, sixteen years of age, while she was a baby sitter at the home of the Cousins family on Sunset Lane in the southwestern part of Columbia. The prosecutrix testified of the facts of the occurrence. Her testimony was sufficient in affording substantial evidence tending to show that the crime of forcible rape had been committed upon her body by someone; but the crime was committed by a masked assailant, and the *586 prosecutrix was never able to identify defendant as the guilty person.
The decisive issues upon this review involve the questions whether or not defendant's verbal admissions of his guilt, his written confession, and testimony of defendant's statements and conduct during a so-called "re-enactment" tour to the neighborhood of the Cousins home were voluntary and consequently admissible as evidence against him, or whether they were, as a matter of law, involuntary and therefore inadmissible, or were inadmissible because obtained in manner violative of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.
In order to determine these decisive and fundamental questions we are duty bound to particularly examine the evidence relating to defendant's arrest, detention and interrogation from the time he was taken into custody on Sunday, December 4, 1949, to and through Friday, December 9th, and until the hours of four or five o'clock in the morning of Saturday, December 10th. But before examining the evidence in detail it is well to here state that upon the issue of "voluntariness" [inasmuch as the trial court admitted into evidence the oral admissions (more aptly, oral confessions of guilt), the written confession and the testimony of defendant's admissions, verbal and by conduct, during the re-enactment tour to the scene of the crime] we should give credence to the evidence introduced by the State, and such other evidence as is not disputed. It is well also to say that the State has the burden of proving the "voluntariness" of a confession. State v. Humphrey, 357 Mo. 824, 210 S.W.2d 1002; State v. Gibilterra, 342 Mo. 577, 116 S.W.2d 88. Furthermore it is observed that, after a preliminary hearing without the presence of the jury on the issue, a trial court is not obliged to submit the issue of the "voluntariness" of a confession to the jury merely because there is substantial evidence tending to show the confession was voluntary however much the evidence of its voluntary character is outweighed by evidence to the contrary. On the other hand, when there is substantial conflicting evidence and the evidence is close, it is better to refer the issue to the jury than to exclude the confession upon the preliminary hearing. Then the evidence introduced before the jury upon the issue of voluntariness of the confession may also be considered by the trial court (and by the appellate court upon review) together with the evidence introduced at the preliminary hearing, and the confession excluded if it is found, from all of the evidence introduced upon the issue, that the confession was involuntary. State v. Humphrey, supra; State v. Cochran, 356 Mo. 778, 203 S.W.2d 707; State v. Ramsey, 355 Mo. 720, 197 S.W.2d 949; State v. Gibilterra, supra. And this court has unhesitatingly held confessions inadmissible as a matter of law where the evidence conclusively shows that they were involuntary. State v. Butts, 349 Mo. 213, 159 S.W.2d 790, 140 A.L.R. 1177; State v. Williamson, 339 Mo. 1038, 99 S.W.2d 76; State v. Ellis, 294 Mo. 269, 242 S.W. 952, 24 A.L.R. 682; State v. Powell, 266 Mo. 100, 180 S.W. 851; Id., 258 Mo. 239, 167 S.W. 559. What is necessary to render a confession involuntary depends, to a large extent, upon the person from whom such confession is obtained. The age, sex, past experience and intelligence of the accused must necessarily be considered. State v. Powell, supra, 258 Mo. 239, 167 S.W. 559; State v. Fredericks, 85 Mo. 145. A confession extorted by mental punishment is as incompetent as one by physical punishment. State v. Butts, supra. And the Supreme Court of the United States (where the issue involved "due process") speaks of the essentiality of "mental freedom" of the accused to confess or deny at the time he confesses. Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192. In Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801, in which an Indiana jury had assessed capital punishment in a homicide case, it was said by Frankfurter, J., "A statement to be voluntary of course need not be volunteered. But if it is the product of sustained pressure by the police it does not issue from *587 a free choice. When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal."
Defendant, a Negro twenty-six years old, was arrested for questioning December 4, 1949, in connection with reported "window peeping," and more serious offenses by Negroes in Columbia. He was interrogated that evening by the arresting officers and by the Chief of Police, and was questioned daily by various officers thereafter until the morning of December 10th. On Wednesday, the 7th, he had been released from custody, but was almost immediately rearrested, conveyed by automobile to the southern section of Columbia to check his explanation of his former presence in that area, and then returned to the city jail.
At about 5:15 in the afternoon of December 9th, David Bear, Esq., then City Attorney of Columbia, came to the police station and interviewed the defendant in a rear room on the ground floor of the building. At the time, the Chief of Police, and a sergeant and patrolman of the State Highway Patrol were present. Defendant had been subjected to interrogation by a highway patrolman with polygraph at "intervals" that afternoon. The City Attorney, witness for the State, questioned defendant from five-thirty until about seven o'clock. Defendant first denied and then admitted "window peeping" in the southeastern section of Columbia, and later admitted window peeping in other parts of Columbia including the southwestern section. Questioned concerning the instant offense, defendant at first denied all knowledge of the facts, but later told the City Attorney he was out window peeping and was at the house where the girl was baby sitting. Defendant said his brother Scotty was along, and they had seen another Negro go into the house on Sunset Lane and commit the (instant) crime of rape. The defendant's brother and the other Negro were brought into the room. The questioners were convinced that defendant "was lying about having seen the other boy' enter the house.
It was during this interview that the City Attorney remarked to defendant, "From what you have said here, Jake, from what you have told me, you know that you wouldn't be safe on the streets of Columbia if everybody in Columbia knew what I know * * * You wouldn't be safe on the corner of Ninth and Broadway right in the middle of Columbia if the people of this town knew what you have told me right here tonight." The City Attorney further testified, "I think Jake admitted that he wouldn't be safe on Ninth and Broadway if the people of Columbia knew what I knew. * * * I think Jake asked me when he heard some noise out in front, I don't know whether it was the garage doors or whether it was the police officers out there talking, but anyway it was some time when there was some activity out there, I think he said `Now, who is out there? What's going (on) out there?' I think he said, `Is there a mob out there?' Now, whether he used the word `mob' I wouldn't say definitely but at least in substance that was what he was asking about." The City Attorney further testified that defendant asked, "`If I tell you fellows the truth * * * will you fellows protect me' or some such words to that effect and we told him that we would assure him that there would be no physical violence of any kind. He would be taken to Jefferson City." It is to be readily inferred that this conversation occurred before defendant made any verbal admission of guilt of the instant offense because the City Attorney said that, before Bradford finally admitted this offense, "why, he asked us, that is Wells and myself, if he would tell us the truth if we would protect him."
The City Attorney testified that defendant was a person "who seemed to have difficulty in understanding your questions. It was difficult for me * * * to get my meaning across to him. * * * I think it was due more to lack of intelligence than his reluctance to answer." Other witnesses for the State testified that defendant is "not very intelligent." (Psychologists, witnesses for defendant, stated *588 that tests disclosed defendant is of "border line" intelligence "similar to those individuals whom you might not call feeble minded and they are not quite normal; they are just a border line level and it is very difficult to determine which side of the border line they belong on." Defendant has ability "about like that of a ten year old child and not a bright ten year old childa normal ten year old child." A person of this particular level has on numerous occasions come in contact with people who have "asserted their superiority and he soon gets the idea he is pretty inferior and that he has to do what he is told." Defendant described the interrogation by the officers"they was saying words and forcing me to say yes and no to the words.")
Defendant having for the moment admitted his guilt of the crime charged herein to the City Attorney, Dr. Griffith, Coroner of Boone County, was requested to come to the police station to make a physical examination in order to verify the fact that no signs of physical violence were visible on defendant's body. And the (then) Prosecuting Attorney was called in for the purpose of taking defendant's statement in behalf of the State. Being interrogated by the Prosecuting Attorney, defendant denied committing the instant crime. During a vigorous examination of defendant, the Prosecuting Attorney called defendant "a God damned liar," and "a son of a bitch or a black son of a bitch." Dr. Griffith, who was armed and who had returned to the room at this time, drew his revolver from a shoulder holster and flourished it. Although the State's witnesses intimated that the doctor was "clowning," the City Attorney testified, " * * * the manner in which he (the doctor) was handling it (the pistol) in the room was enough to make anybody * * * uncomfortable or afraid of the gun. * * * I was afraid of the gun myself and I went out and called the Chief of Police to tell him I thought he ought to get Griffith out of there with that gun." In the defendant's presence the doctor made, or pretended to make a telephone call. A witness for the State testified the doctor said on the telephone, "You boys don't need to come down here now." And one Royce, witness for the State, then an employee of the City who had been called in for the purpose of taking and transcribing stenographic notes of defendant's statements, testified that Dr. Griffith said, "Hold them back. This boy is going to come through."
The time between the hours of approximately 8:30 p.m. December 9th and 12:30 or 1:00 a. m. December 10th was consumed in the preparation of a written statement in which defendant confessed his guilt of another offense. See State v. Bradford, 362 Mo. 226, 240 S.W.2d 930.
Early in the morning of December 10th, defendant was taken by the officers to the southwestern part of Columbia. The party included the Chief of Police; police officers; highway patrolmen; two representatives of the Press; and Stuart Parker, a Negro undertaker, President of the State Society for the Advancement of Colored Peoplein all ten or fifteen or twenty persons. The tour took "about two hours and a half." It was a "chilly," "raw" night. Defendant was handcuffedhe had no gloves. He had no coat and no hat. During this tour of about two and a half hours, defendant is said to have conducted the party to various points where he said he had been and, after being thrice admonished by the Prosecuting Attorney to take them "to the baby sitter's house," arrived in the vicinity of and designated the Cousins house on Sunset Lane, a deadend streetthe Cousins house is the last house on the south side of that street. Here in the darkness he is said to have correctly indicated the location of furniture in the Cousins home. And here again, according to the State's witnesses, defendant denied and then again admitted guilt to Stuart Parker. Defendant again denied his guilt while the witness Royce was transcribing his notes into the purported confession of defendant's guilt after the return from the tour. The purported confession, a transcribed interrogation in question and answer form, was signed by defendant *589 sometime between 4:00 and 5:00 a. m., December 10th.
It is true there was evidence tending to show that defendant was "fed" the evening of December 9th, and that he was given a "coke" and water to drink, permitted to go to the toilet, and given a cigarette when he asked for one. Several of the State's witnesses described the questioning as "polite," and conducted in a "friendly atmosphere"; but, as we have seen supra from the testimony of witnesses for the State, the apparently friendly atmosphere, if so, was fouled by the untoward compelling circumstances stated by the State's witnesses as we have related.
Assuming an absence of planned or intentional compulsion by fear on the part of the City Attorney in remarking to defendant that he would not be safe on Broadway if the people of Columbia knew all that defendant had theretofore divulged in answer to the attorney's questions, the questioner's remarks were such as would tend to intensify the fear of mob violence which clearly already existed in the mind of defendant. Having this fear, and having heard the City Attorney's remarks, defendant must have in his own almost mentally feeble way realized he was at the mercy of his questioner. It was indeed not strange that this illiterate with an (almost) feeble mind, after hours of questioning on that day and on previous days, had reached the point where he thought it was the only way out, and was anxious to say what he was asked by his questioner to say in the hope of repose and physical safety. Even so, he was not constant in his admissions of guilt, but again and again denied guilt, and again and again admitted guilt upon further inquiries by the officers. On one of the latter occasions, when he was denying his guilt, occurred the "pistol" incident. And then there was the doctor's conversation by telephone which implicitly conveyed the threat that a number of persons were in readiness to do violence to defendant and were only detained because he was going to "come through." Defendant was from December 4th to 10th held in the City jail or was in the custody and control of the police; and, in the various daily interviews, including those during which he admitted guilt, he was being interrogated by the City Attorney, the Prosecuting Attorney, the police, members of the State Highway Patrolpersons in authority. It is conceded by the witnesses for the State, officers of the City and State, that defendant had no counsel; had not been apprised of his right to have counsel; had not been told that he did not have to make a statement; and had not been told of his right to visit with relatives and friends. He was not told that his statements might be used against him "until I (the Prosecuting Attorney) took the written statement." As stated, he had been in custody since December 4th. No charge had been filed against him. He had not been taken before any judge or magistrate.
Having carefully examined all the evidence relevant to the issue and having a regard for defendant's "low-level" intelligence, we are of the opinion that defendant's statements were coerced by inspired fear, by a promise of protection, by intermittent daily interrogations over the long period of his detention during which, we must conclude, his almost feeble mind was surely overreached rendering the statements the reverse of voluntary; and that, because of the methods used in procuring the statements, their use in the trial was violative of the procedural standards contemplated by the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. State v. Butts, supra; State v. Williamson, supra; State v. Powell, supra; State v. Brockman, 46 Mo. 566; Ashcraft v. Tennessee, supra; Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224. See also Watts v. Indiana, supra; Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810; and Harris v. South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815.
It was but natural that the trial court in ruling the admissions and confession were admissible was to a great extent influenced by the decision of this court in State v. *590 Bradford, supra, 362 Mo. 226, 240 S.W.2d 930. However, the evidence introduced upon the issue of "voluntariness" in that case was in several material respects different from the evidence in this case. The record in that case does not show that the compelling conduct of various officers was antecedent to defendant's first verbal admission of guilt of the instant charge. The record in that case shows no evidence of the City Attorney's remarks to defendant pertaining to the danger of mob violence should defendant appear upon the streets of Columbia. The record in that case does not disclose that the promise to protect defendant was made in response to the defendant's question, "If I tell you fellows the truth * * * will you fellows protect me." And the evidence pertaining to the conduct of the Coroner was not so clearly significant as in the instant record. Furthermore, there was no clear showing in that record that defendant had been questioned by various officers daily since his arrest on December 4th. In this very connection, although the evidence in our case shows defendant was questioned daily, in our case there was no evidence introduced by the State relating to the conduct of the questioning officers during the inquiries on days prior to December 9th. Defendant testified that upon being "picked up," December 4th, he was "downstairs" and questioned five hours. They (the arresting officers) twisted the leaders of his shoulder, "beat on the can and hit you at the same time, hit on the can I was sitting on and tossed me under that big light and sweat me * * * trying to get me to pop out on something I hadn't did * * * About the baby sitter and this here out here across the Hinkson Creek." In our case, the arresting officers were not called to the witness stand by the State, and no witness for the State told of the manner or method of inquiry, or of the treatment of defendant, except as we have detailed as of December 9th and 10th.
As we have said, the prosecuting witness was unable to identify defendant as her assailant. In some respects her testimony tended to show that defendant was not the guilty person. The prosecutrix said she could not definitely say whether her assailant was a Negro or a white man. "He was either a dark complected white person or a Negro, that's all I can say. He was just dark." She did not smell any body odor or odor of cigarettes or alcohol. He blindfolded prosecutrix with a clean white handkerchief. He wore "sort of dress gloves." His voice did not have a real "Negro accent." He talked "natural * * * He didn't use a lot of `ain'ts' or anything like that; it wasn't real poor grammar that way." Defendant "rambles" when he speaks. He talks like the kind of a person he isan illiterate Negro. He is a garbage man's helper, and smokes cigarettes and drinks beer. Aside from defendant's admissions, verbal and by conduct, and the written confession extracted by the officers, there is apparently no evidence connecting defendant with the crime herein of which he has been charged and convicted. The following language of this court in State v. Powell, supra, 266 Mo. at page 108, 180 S.W. at page 852, is peculiarly applicable here"considerations of justice demand that great caution should be used and great exactness required in so close a case upon so grave a charge. * * * Abstractly, a wrong ruling as to a guilty person does not harm society, and but aids in doing justice upon him who deserves punishment; but such a ruling lives to be a precedent for the hurt and harm of the innocent, and so our duty is to write the law by which both the guilty and the innocent may be safely tried."
The judgment should be reversed and the cause remanded.
It is so ordered.
LOZIER and COIL, CC., concur.
PER CURIAM.
The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.
All of the Judges concur.