**STATE of Missouri, Respondent,**

v.

*Bert Leroy HUNTER, Appellant.*

No. 54769.

Supreme Court of Missouri,
Division No. 1.

July 13, 1970.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, St. Louis, for respondent.

Fred H. Maughmer, Jr., John W. Newhart, Savannah, for appellant.

HOUSER, Commissioner.

Bert Leroy Hunter was convicted by a jury of murder in the first degree and sentenced to life imprisonment. No eyewitness to the killing testified. Defendant's connection with the affair was established only by his confession. Hunter has appealed on the sole ground that the court erred in admitting his confession because it was not given voluntarily.

First, it is said to have been involuntary because it was coerced by the police by repeated and protracted custodial interrogation without counsel and by repeated false promises by police that defendant would receive help and a reduced charge for his cooperation.

■ It is clear that interrogations persisted in to an unreasonable extent, there-

by producing mental anguish, or leading the suspect to believe that he must make a statement to secure a surcease therefrom, State v. Thomas, 250 Mo. 189, 157 S.W. 330, or amounting to mental punishment, State v. Williams, Mo.Sup., 369 S.W.2d 408; State v. Ellis, 354 Mo. 998, 193 S.W.2d 31, should be rejected as involuntary. Likewise, confessions induced by the influence of hope of leniency, State v. Ball, Mo.Sup., 262 S.W. 1043, hope of clemency, State v. Hart, 292 Mo. 74, 237 S.W. 473, or hope of mitigation of punishment for the crime charged, or of "worldly advantage," State v. Williamson, 339 Mo. 1038, 99 S.W.2d 76, are not voluntary and are not admissible in evidence.

When the voluntary character of a confession is challenged (but not otherwise, State v. Jackson, Mo.Sup., 448 S.W. 2d 895; State v. Gray, Mo.Sup., 432 S.W. 2d 593) it is the duty of the trial court to conduct a preliminary hearing outside the hearing of the jury to determine whether the confession is admissible in evidence, that is, whether it was free of inducement and was voluntarily given. This rule runs through our law from Hector v. State (1829), 2 Mo. 166, to the present time. State v. Glenn, Mo.Sup., 429 S.W.2d 225. The court hears the evidence on the mixed question of law and fact and weighs the evidence. State v. Di Stefano, Mo.Sup., 152 S.W.2d 20. If the evidence shows that the confession is voluntary the trial court admits the confession in evidence, first making the finding of voluntariness in accordance with the rule of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed. 2d 908 and Sims v. State of Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593, as set forth in State v. Glenn, supra, 429 S.W. 2d, l. c. 237 [29]. If the evidence shows that the confession is involuntary the trial court must exclude the confession. The burden of proof of voluntariness is upon the State when the confession is obtained while the suspect is in custody. State v. Williams, supra; State v. Bradford, Mo. Sup., 262 S.W.2d 584, 586, and cases cited.

The State meets the burden of proof by presenting a prima facie showing of voluntariness. State v. Nolan, Mo.Sup., 423 S.W.2d 815, 818 [9]. The controlling standard which the Supreme Court applies in the making of that determination is whether the evidence *conclusively* shows that the confession is involuntary. State v. Statler, Mo.Sup., 331 S.W.2d 526, 530 [9]; State v. Cochran, 356 Mo. 778, 203 S.W.2d 707 [1]; State v. Pughe, Mo.Sup., 403 S.W.2d 635, 641 [10].

When the confession was sought to be introduced in evidence Hunter's attorney objected on the ground of coercion. The court conducted a preliminary hearing outside the hearing of the jury, at the conclusion of which, while expressing concern and "considerable doubt" about certain testimony given by Sgt. Shirley of the Missouri State Highway Patrol, the trial court made a finding of record that defendant was adequately advised of his constitutional rights; that defendant's statements were made voluntarily and were not procured by coercion, threats or fear and were not induced by promises of leniency, and that they were admissible in evidence. The trial was resumed before the jury; the confession used against Hunter; and while Hunter did not testify before the jury the officers testified to substantially the same facts as in the preliminary hearing and the court properly instructed the jury that before they could consider any alleged statement of Hunter it must have been made voluntarily.

The charges made by Hunter on this appeal require a full and complete review of the evidence of the circumstances surrounding the giving of the confession.

The killing occurred in Andrew County on June 16, 1968. In the early hours of the morning of June 18 Hunter was interrogated for about an hour at the Atchison, Kansas jail with respect to the killing. The city police had stopped Hunter and one Carl Paxton as they were driving in that city, and Hunter had been arrested.

Apparently the city authorities notified the Missouri authorities that Hunter was in custody. Sergeant Rhodes of the Missouri State Highway Patrol and the city chief of police questioned him. At that brief session Hunter made no incriminating statements. At the request of the sergeant Hunter promised to appear personally at state highway patrol headquarters at St. Joseph, Missouri the next morning for further questioning. Hunter voluntarily appeared there the next day and was questioned by Sgt. Shirley. Hunter appeared there again on the 19th or 20th of June, voluntarily, and further discussion was had with the officers about the killing. Hunter was warned as to his constitutional rights each day before questioning began. He was not charged, restrained or under arrest on either of these occasions and he made no incriminating statements, maintaining that he was elsewhere at the time of the killing. The Prosecuting Attorney of Andrew County was present on one of these occasions. Hunter, who was hostile to the prosecuting attorney, called the latter an S.O.B., told him to "get out" and refused to talk further in his presence. The prosecuting attorney withdrew and the talks continued. There is no indication that the interviews at St. Joseph lasted over an hour or two. A few days later Hunter was arrested in Kansas on a charge of illegal possession of a pistol, and from July 13 to September 12 he was in jail in Atchison, Kansas. On July 15 and 16 Missouri highway patrol officers interviewed Hunter in the Atchison jail. These interviews, which lasted about 2 hours each, were conducted at the request of the Prosecuting Attorney of Andrew County. Hunter was again warned of his constitutional rights before each of these interviews took place. On July 15 the officers told Hunter that Carl Paxton had made a statement, a partial admission implicating Hunter. Hunter orally admitted some knowledge of the affair but claimed that he was not inside the tavern where the killing occurred; that he was let out of the car south of town and was picked up later by Paxton and another per-

son, whom he would not identify. Hunter was most concerned about the charge pending against him in Kansas, because he had four previous felony convictions in that state. On July 16 Sgts. Shirley and Rhodes again interviewed Hunter at the jail, this time for the purpose of taking a statement. They were joined by Lois Sowards, a secretary in the patrol office, who took shorthand notes on the conversation between Hunter and the officers. Hunter did not want to make a statement until he talked to the prosecuting attorney. He wanted the latter to come see him to talk about the charges. There was discussion as to what charges would be filed against Hunter. The officers explained that it was the place of the prosecuting attorney to file charges; that it was not "up to the patrol officers what charges would be filed." Several times Hunter requested that Sgt. Shirley confer with the prosecuting attorney "regarding having the charges reduced," and he wanted to see if the prosecuting attorney could get the Kansas charges dropped. Hunter said the only thing he was worried about was "the Kansas law"; that if the prosecuting attorney would get the Kansas charges dropped he would give a statement "in making a deal"; that he was not inside the place where the killing occurred and was not worried about any charge of murder against him "unless they catch me as an accessory." Hunter also said, "Promise me immunity and I can tell you who had the pistol when I seen them and who had blood on his hands and who said 'Gun it.' * * * Offer me immunity now in writing and I will tell you. I will give you a statement. I can tell you where the gun is. I can take you to the place. * * * I don't want to tell you where the gun is till you talk to [the prosecuting attorney] and see if * * * [interruption]."

Sgt. Shirley testified that he relayed Hunter's message to the prosecuting attorney, who told Sgt. Shirley that when he was satisfied that Hunter would cooperate and give a truthful statement he would

consider coming to Atchison, and that the prosecuting attorney said to tell Hunter that if he would cooperate "it's possible, very possible, that they would consider a lesser charge"; that Sgt. Shirley went back to the Atchison jail and told Hunter that "it's possible that [the prosecuting attorney] would consider a lesser charge if he would cooperate."

Sergeants Shirley and Rhodes, accompanied by Lois Sowards, the secretary, returned to the Atchison jail on August 5 at the request of Hunter, who had asked that Sgt. Shirley come to Atchison. Before any questioning began Sgt. Rhodes read to Hunter from a sheet of paper containing the warnings about his constitutional rights, and he signed a written waiver, as follows

"Place    Atchison,    Kansas

Date    8–5–68

Time    1:37 P. M.

#### "YOUR RIGHTS

"Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can (and will) (B.L.H.) be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer.

#### "WAIVER

"I have read the statement of my rights shown above. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer.

I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me.

"Signed Bert Leroy Hunter

"Witness James C. Rhodes, Sgt.

Witness Joe Shirley

Time 1:39 P.M. 8–5–68"

Before Hunter signed the waiver Sgt. Rhodes handed the paper to Hunter, who read it and in answer to questions as to each and every right stated that he understood his rights. The officers testified that at the August 5 session no promises of leniency were made to Hunter and that he was not subjected to duress or coercion to secure any oral or written confession from him. Neither the officers nor Mrs. Sowards testified that there was any discussion relating to a "deal" at the August 5 session. Sgt. Shirley began the questioning. Lois Sowards took down the questions and answers in shorthand. Later that day in Hunter's presence she transcribed them into nine pages of typewriting which Hunter read and corrected. After initialing the corrections Hunter signed his name on each of the 9 pages. The confession related facts showing Hunter's participation with Paxton in the killing of John Lyle in the tavern, the stealing of his money, disposal of the gun, division of the loot, etc. On the first and last pages there was a statement that no threats or promises had been made to Hunter. In the statement Hunter indicated that he realized the possibility that charges would be filed on the basis of the statement. (No charges had been filed on August 5.) The entire session lasted about 4 hours.

Sergeant Shirley further testified that on August 5 he asked Hunter what would happen if after signing this statement the prosecuting attorney would charge him with first degree murder. Hunter replied that he would claim that he had not been informed of his rights; that he had not understood his rights; that "they will believe

me and not you"; that he had two witnesses, one of whom was a minister, who would establish an alibi for him, and that he would have himself declared a mental incompetent. According to Sgt. Shirley he returned to visit Hunter on August 26 at which time Hunter "kept asking" that he contact the prosecuting attorney, wanting to make some kind of deal. Sergeant Shirley told Hunter he had no authority to make a deal but that he would relay the information to the prosecuting attorney, who would do what he saw fit with it. On September 12 there was further conversation in which Hunter "was desirous of having lesser charges filed." Hunter said he thought the first degree murder charge was too severe; that he thought at one time that he might be charged with stealing over $50; that he would testify as a state's witness against Carl Paxton if the prosecuting attorney would cause the Kansas charges to be dropped, and if not he would be unable to testify against Paxton.

Hunter hired an attorney in Kansas, an agreement was reached whereby in exchange for Hunter's waiving extradition the Kansas charge relating to a pistol was dropped, and Hunter was returned to Missouri.

Hunter testified at the preliminary hearing outside the hearing of the jury. He was 22 years of age, and had completed either the ninth or eleventh grade. He stated that at the July 16 interview Sgt. Shirley told him that Carl Paxton had made a statement implicating Hunter in the John Lyle crime but that both patrol officers told Hunter that they did not believe that he was the one; that he couldn't have pulled the trigger and they were willing to help him if he would cooperate; that the prosecuting attorney hated Carl Paxton and believed that Carl Paxton did the actual shooting and they were willing to cooperate with Hunter if he was willing to cooperate with them; that they believed Hunter would receive help and that the officers themselves would help him; that later at the jail Sgt. Shirley told Hunter that he had talked to the prosecuting attorney about the case and that the latter was willing to help Hunter if he would cooperate; that the sergeant said he had a telephone conversation with the prosecuting attorney who had told him during the telephone conversation that if Hunter would cooperate charges could be as low as stealing over $50. Hunter also testified that Sgt. Shirley said the prosecuting attorney stated that a charge of stealing over $50 would be filed but that he told Sgt. Shirley that he did not want a charge of stealing over $50 filed against him; that he wanted to speak to the prosecuting attorney and work out some way he could have a sentence of a year in the county jail; and that the officer told Hunter that he did not know whether the prosecuting attorney would go that low with charges or not but he would talk to him about it; that the officers wanted a statement and that he understood from Sgt. Shirley that if Hunter made a statement some type of lesser charge would be filed or would be considered, and that was the only reason he later gave the written confession. Asked why he signed the waiver of rights he answered, "Well, because I thought that I would receive a charge of stealing over $50.00 at the most"; that he was offering his cooperation in the case " * * * under the assumption that a deal was to be made," that Sgt. Shirley said that the prosecuting attorney said that a reduction of charges was possible and Sgt. Shirley gave Hunter the impression that the prosecuting attorney was very willing to cooperate and that a reduced charge would be filed, and that was the reason he changed from denying any implication in the crime to the giving of an incriminating statement; that he would not have given the statement August 5 but for this promise of a reduced charge. Hunter further testified that mention was made of cooperation at the August 5 session; that Sgt. Shirley gave him the impression that he was very willing to cooperate and that a reduction of charges was possible; that there was some conversation about an over $50 stealing charge and a year in jail; that later

in August the prosecuting attorney and Sgt. Shirley came to Atchison and handed Hunter a first degree murder warrant; that Hunter asked why he was being charged with this, to which the prosecuting attorney answered, "Mr. Hunter, you don't have anything to deal with"; that Hunter told him that he had the understanding that he was to be charged with stealing over $50.

On none of the several occasions when the officers interviewed Hunter was an attorney present to represent him, nor was an attorney made available to him. Sergeant Shirley testified that Hunter was fully advised and aware of his right to an attorney—was "well-versed" in the law—and that Hunter stated that he did not want an attorney. This was not denied by Hunter. He did not testify that he had requested the appointment or the advice of an attorney and he did not complain of the lack of counsel. Nor did Hunter while testifying complain that the interrogations were persistent, unduly extended, or in any way exhausting or coercive.

There is no evidence in this record of coercion by repeated and protracted custodial interrogation. The six interviews took place over a period of approximately seven weeks, with time intervals of several days between the June and July and the July and August sessions. The first five interviews lasted only an hour or two. The August 5 session at which the written confession was obtained lasted four hours. There is nothing to indicate that these interviews were conducted in uncomfortable quarters, after physical deprivation, under oppressive circumstances or in an atmosphere of hostility, intimidation or coercion. Hunter made no claim in his testimony that his will was overcome by persistent, rigorous, relentless questioning, or that the interrogation was overly long or too frequent. On the contrary, these interviews appear to have been conducted in a calm and dispassionate manner, with regard for the rights of the suspect. Hunter voluntarily appeared for the two

interviews at the St. Joseph patrol office. All of the other four interviews were conducted in a Kansas jail where Hunter was held on Kansas charges. It was at Hunter's own request that the interview of August 5 took place. Instead of conclusively showing that Hunter's confession was sweated out of him the evidence strongly supports a finding and we do find that the confession was not involuntary on the basis of police coercion arising out of repeated and protracted custodial interrogation.

We have reached the conclusion that the evidence does not conclusively show that the confession was induced by false promises of leniency, but rather that in the totality of the circumstances the confession was voluntary, and that therefore the trial court did not err on this basis in admitting the confession. The State made a prima facie case of voluntariness by showing that at all stages of the interrogation Hunter was informed of his constitutional rights and that he understood his rights; and that no physical force or coercion, promises, threats or other unlawful means of inducement were employed in obtaining the confession. The prima facie case thus made was not destroyed by the testimony of State's witness Shirley that it was possible that the prosecuting attorney would consider a lesser charge if Hunter would cooperate. Such a result would follow only if the evidence conclusively showed that the confession was induced by the prosecutor's message. State v. Statler, State v. Cochran and State v. Pughe, supra. There was no such conclusive showing, as a matter of law, in this case. The message delivered by Sgt. Shirley did not contain a promise positive in its terms nor was leniency clearly implied. It was ambiguous and subject to interpretation. All minds would not interpret it as a definite commitment. It might be interpreted not as a promise or probability upon which an expectation or hope of worldly benefit against the possible criminal charge might reasonably be founded, but merely as evidence of a conciliatory disposition on the part of the prosecuting at-

torney which might lead to further negotiation and the possibility of finally arriving at an acceptable "deal" with respect to the charges to be filed. All the evidence shows that the idea of a "deal" originated in the mind of Hunter and was not instigated by the officers. Hunter took the initiative. He solicited the sergeant to act as a go-between between him and the prosecuting attorney, and asked the sergeant to have the prosecuting attorney visit him in the Kansas jail to discuss the matter of a reduced charge and the dismissal of the Kansas charge, or to relay his message that he would give a statement in exchange for a reduced charge. He was preoccupied if not obsessed with the idea of a deal. His testimony that he gave the statement because he had an understanding that a lesser charge, perhaps a charge of stealing over $50, would be filed, even if not entirely disbelieved, might be attributed to wishful thinking on his part. With his past criminal record he strongly wished to secure dismissal of the Kansas charge. This wish, coupled with his desire to be treated as lightly as possible for his participation in the Missouri killing, may in his mind have twisted a noncommittal message into a binding understanding. "[A] hope which originates in the mind of the person making the confession, and springs from seeds of his own planting, is not sufficient to render the resulting confession inadmissible." 23 C.J. S. Criminal Law § 825 b., p. 212. The message was not sufficiently definite and unconditional to constitute a legal basis for Hunter's hopes. See United States v. Ferrara, 2 Cir., 377 F.2d 16 [1, 2]; Fernandez-Delgado v. United States, 9 Cir., 368 F.2d 34. In any event, assuming that the message was reasonably sufficient to induce hope or expectation that he would not be prosecuted to the full extent of the law, there is the further question whether the hope or expectation lighted up on July 16 was still in existence and effective at the time he signed the confession on August 5. On this question Hunter is entitled to the benefit of the rule that hope or fear first excited by a promise is presumed to continue until it appears that such original influence has ceased to operate. State v. Brown, 73 Mo. 631, 633; State v. Condit, 307 Mo. 393, 270 S.W. 286, 290 [3]. That presumption, however, is overcome by the following facts and circumstances: The confession was not immediately forthcoming, within the next few hours or days after Hunter got the message, and was not forthcoming for nearly three weeks, which considerable period Hunter utilized to consider the matter before calling for Sgt. Shirley to come see him. In other words, the influence was not immediately effective. This lapse of time before acting is consistent with the view that Hunter exercised his own independent judgment about confessing, and that his will was not overborne by the onrush of hope; that the prosecutor's message did not have "such an enduring effect" as to make involuntary a confession made three weeks later. Compare Parker v. North Carolina, October Term, 1969, May 4, 1970, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785. There is the further significant fact, which we find from the evidence, that there was no discussion of the so-called "deal" on the 5th of August when Hunter was finally ready to give his confession. If in fact there had been such an understanding Hunter, who in his testimony showed that he knew there was such a thing as a written guarantee of immunity, would doubtless have insisted upon at least an oral confirmation of the deal before signing away his rights and confessing his crime. Additionally, the officers at that time carefully and scrupulously advised him of his constitutional rights. He knew that he did not have to give this statement and that it would be used against him. Furthermore, in his written confession he twice recited that no promises had been made to him and demonstrated his knowledge that the confession probably would be used as the basis of a criminal charge. The discussion between Sgt. Shirley and Hunter on August 5 as to what would happen if the prosecuting attorney filed first degree murder charges against him, and statements made by Hunter in the interviews later in

August, confirm our conclusion that there was no "deal" at the time Hunter confessed, and that the influence of the hope or expectation aroused by the message had been removed by August 5, if it ever existed in the first place; that the connection between the message and the confession had "become so attenuated as to dissipate the taint." Wong Sun v. United States, 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441; Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307. Finally, it stretches credulity to believe and it is unreasonable to propose that a prosecuting attorney would enter into an agreement with a suspect to let him off with a charge of grand stealing in exchange for his confession demonstrating the commission of a ruthless, premeditated, deliberate murder.

The only authority cited by Hunter on this phase of the appeal, State v. Williamson, supra, is to be distinguished from this case on these grounds: the promise there was definite; the confession followed closely upon the heels of the promise (the next day); the officer making the promise testified that he presumed his promise had some influence in inducing the confession; the record clearly established that the promises made by the officers did arouse a hope or expectation in Williamson that he would be sent to the penitentiary at Chester, Illinois; that it was a promise of immunity, and that these promises were sufficiently definite and unconditional to constitute a legal basis for his hopes.

Hunter's final point is that the court erred in admitting the confession because his constitutional rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974, were not knowingly and intelligently waived. The argument, without any attempt at demonstration, is that the State failed to carry the heavy burden which rests upon the State to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retain or appoint counsel. Although not a highly educated man, Hunter is an intelligent and knowledgeable person with a long record of involvement with the criminal law, whose answers to questions propounded to him during the preliminary hearing amply demonstrate his familiarity with legal terms and concepts and criminal procedures. Six times he was informed that he had a right to remain silent, and six times he ignored this right and talked. There is no doubt on this record that he fully understood the privilege against self-incrimination. Six times he was offered counsel and informed that if he did not have the resources to employ counsel he would be afforded counsel without charge. He persistently refused to take advantage of this offer, stating that he did not want a lawyer. He was a grown man, fully able to converse in the language of his captors and to negotiate with them, fully cognizant of the functions and benefits of counsel, and fully able to appraise his personal need or lack of need of counsel. The fact that Hunter did not have counsel during the custodial interrogation and when his confession was taken did not render the confession invalid per se. State v. Davis, Mo. Sup., 400 S.W.2d 141, 149 [16]; State v. Pughe, supra, 403 S.W.2d l. c. 640 [8]. This point is without substance.

The judgment of conviction is affirmed.

WELBORN, C., concurs.

HIGGINS, C., not participating.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

SEILER, P. J., BARDGETT, J., and CORNING, Special Judge, concur.

HOLMAN, J., not sitting.