STATE of Missouri, Respondent,

v.

Cornell JACKSON, Appellant.

No. KCD 28725.

Missouri Court of Appeals,
Kansas City District.

Aug. 8, 1977.
Motion for Rehearing and/or Transfer
Denied Aug. 29, 1977.

Leonard W. Buckley, Jr., St. Louis, for appellant.

John D. Ashcroft, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, for respondent.

Before SWOFFORD, P. J., PRITCHARD, C. J., and DIXON, J.

PRITCHARD, Chief Judge.

Appellant was charged (upon the state's sustained motion to reduce the charge) and convicted of second degree murder by the verdict of a jury, and was sentenced by the court, upon its finding that appellant was a second offender, to 99 years imprisonment in the Department of Corrections. His first point is that the court erred in not suppressing a tape recording of his confession (which was admitted into evidence before the jury, and which was the only evidence submitted as to his guilt of the crime charged) because it was obtained in violation of his constitutional rights.

Lieutenant Harold V. Atkinson, a Missouri State Penitentiary corrections officer,

was found stabbed to death in a cell on January 20, 1975. Thereafter, other inmates and appellant were interviewed by investigators, and appellant was interviewed by Cole County investigator, Mark Schreiber, four times, the first time on February 11, 1975, from 7:40 to about 9:10 p. m. At that time appellant was advised of his rights and given a "rights card" but he refused to sign the card or to make any statement whatsoever. It appears that appellant was interviewed two or three times by Captain Jack Stewart, but no confession was made to him personally by appellant.

The second interview was about 22 hours after the first. Appellant did then sign a "rights form" and did give some statements about the murder, but did not implicate himself. About three hours later a third interview was conducted in the warden's office, with Schreiber, Highway Patrolman George Payne and Captain Jack Stewart, of the penitentiary, present, at which time Schreiber did not again advise appellant of his rights. At this third interview appellant made statements implicating himself in the murder, and an attempt was made to make a tape recording of the interview, but it failed because the operator of the machine failed properly to depress one of its control buttons. About eight hours later the same morning (February 13, 1975), at 10:20 a. m., appellant had the fourth interview, at which time he was again advised of his rights and signed a "rights card", and at which a successful tape recording was made.

According to Schreiber at the time of the first interview when appellant stated that he did not wish to make a statement, the questioning ceased. At the third interview, at which appellant implicated himself, his answers were given voluntarily and without coercion—there was no physical abuse; appellant's speech was coherent; he did not appear to be on drugs or intoxicants; and he appeared to be in full possession of his mental faculties. Jackson substantially corroborated Schreiber in these respects, which were again testified to before the jury. Schreiber denied telling appellant what to say, and he did not tell him that about 25

minutes earlier he had obtained a taped statement, which implicated appellant, from inmate George Williams.

Appellant's version of the interviews at trial was that he had been beaten and kicked by Stewart and a Lieutenant Lorts after the first interview after he refused to make a statement; Schreiber and the warden had forced him to make statements at the fourth interview; the only reason he signed the waiver of rights forms was that he feared for his life, which had been threatened by his interrogators; and the warden had promised him a lighter sentence if he would confess.

At the close of the hearing on the pre-trial motion to suppress, the court found that the tape recording was authentic, that speakers were capable of being identified; that the statement of appellant was made voluntarily, and was not a product of coercion, promises, threats, or fear, nor was it induced by promise of leniency; that the *Miranda* warnings were given and appellant knowingly, willingly and intelligently waived his rights; and that he knowingly and willingly waived counsel. The court further found, for those reasons, beyond a reasonable doubt that the statement was competent evidence, and overruled the motion to suppress it. Although not a point here, it is clear that the court complied with the requirements of *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); and *Sims v. Georgia,* 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967).

The tape and the recording device have been submitted to this court, and the tape has been listened to by the writer of this opinion. It shows that the interview began at 10:16 a. m., on February 13, 1975, with appellant present, in the Associate Warden's office at the State Penitentiary. It was specifically stated that the interview was for the purpose of investigation of the murder of Lieutenant Atkinson. Also present were the members of the investigation team. Appellant was specifically advised of his rights: That he had the right to remain silent; any statements made by him

could be used against him in court; he had a right to have a lawyer with him during questioning; that if he was indigent a lawyer would be appointed for him; and (importantly) that he had a right to stop answering questions at any time. Appellant answered that he understood his rights, and affirmatively answered that he wanted to sign the waiver of rights form, which he did, and that he wanted to give the statement. Then, in quite apparent intelligence, clarity and in detail, appellant, mostly in narrative form, described the stabbing death of Lieutenant Atkinson, his own participation in it and the participation of each of his accomplices, including hiding the body under a cell bed, the clean up operations, and down to the disposal of the knife used by him in the stabbing. Appellant answered affirmatively that his statement was given voluntarily, and that there were no promises, coercion or threats relative thereto.

 The burden of proof of establishing the voluntariness of a confession, taken while a suspect is in custody, is, of course, upon the state. *State v. Hunter,* 456 S.W.2d 314, 316[3–5] (Mo.1970); *State v. Blankenship,* 526 S.W.2d 78, 81[4, 5] (Mo. App.1975). That burden is met if the state presents a prima facie showing of voluntariness, and the standard is whether the evidence shows conclusively that the confession is involuntary. *State v. Hunter,* supra.

 Under the evidence, except for one occasion, appellant was clearly given the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There was testimony on behalf of the state both at the pre-trial hearing and at trial that appellant had not been threatened, coerced, physically abused or otherwise induced to sign the *Miranda* forms, or to give the statements. In this posture, the credibility of his own testimony concerning the confession was for the jury to determine.

Because he was interrogated six times, two by Stewart, and four by Schreiber, during about 20 days, appellant contends his will was broken down to the point

where his confession was obtained. A similar claim was made in *State v. Hunter,* supra, which was discussed at 456 S.W.2d 302: "The six interviews took place over a period of approximately seven weeks, with time intervals of several days between the June and July and the July and August sessions. The first five interviews lasted only an hour or two. The August 5 session at which the written confession was obtained lasted four hours. There is nothing to indicate that these interviews were conducted in uncomfortable quarters, after physical deprivation, under oppressive circumstances or in an atmosphere of hostility, intimidation or coercion. Hunter made no claim in his testimony that his will was overcome by persistent, rigorous, relentless questioning or that the interrogation was overly long or too frequent. On the contrary, these interviews appear to have been conducted in a calm and dispassionate manner, with regard for the rights of the suspect." Here, appellant's only claim was that he was beaten and kicked after the first interview, that he was forced to make statements at the fourth interview, and that he signed the *Miranda* forms and made statements because he feared for his life which was threatened. These claims were controverted by the state, both in the pretrial hearing and at trial, and the jury, as it had a right to do, found against appellant's version. Appellant made no claim of coercion as to any of the factors above quoted from the *Hunter* case which might, if believed by the jury, lend some substance to his contention. Certainly, under the evidence, appellant's confession was not involuntary as a matter of law because of the six interviews.

 Appellant further contends that his confession was involuntary because he was interviewed after the first one, when, upon being advised of his rights, he was subsequently interviewed which was impermissible under the *Miranda* decision which holds that once an accused chooses to remain silent interrogation must cease. As noted, upon being advised of his right to remain silent at the first interview, appellant chose

not to give a statement, and interrogation did immediately cease. On all occasions except on the third interview, appellant was advised of his right to remain silent. Thus, his fifth amendment right not to incriminate himself was "scrupulously honored" within the requirements of *Miranda. Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), controls. There, the defendant, in custody for robbery, upon being advised of his *Miranda* rights refused to give a statement, and interrogation immediately ceased. Two hours later the defendant was again interviewed by another detective about a different crime, a murder. He was then again advised of his constitutional rights, but this time he waived the rights and confessed to the murder. The issue presented to the court was "whether the conduct of the Detroit police that led to Mosley's incriminating statement did in fact violate the *Miranda* 'guidelines', so as to render the statement inadmissible in evidence against Mosley at his trial." (96 S.Ct. 324) More specifically, the question was whether after a person indicates that he wishes to remain silent a resumption of questioning is permissible. The passage from *Miranda* (384 U.S. at 473–474, 86 S.Ct., at 1627), that the interrogation must cease when the person in custody indicates that he wishes to remain silent was analyzed and discussed by the court as to possible constructions. It was first said that a continuation of custodial interrogation after the momentary cessation would frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the accused. The court then rejected the other extreme of "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances" because it "would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." It was said that the passage from *Miranda* could not sensibly be read to create a per se proscription of indefinite duration upon any

further questioning by a police officer on any subject once the person in custody has indicated a desire to remain silent (noting at footnote 9, 96 S.Ct. 326, that a vast majority of federal and state courts so hold); that "The critical safeguard identified in the passage at issue is a person's 'right to cut off questioning';" and that this right, under *Miranda,* must be " 'scrupulously honored.' " The court noted that the two hour passage of time before Mosley was again interrogated (but about a different crime) was significant and that he was provided a fresh set of warnings. Here, appellant was given new warnings and was questioned 22 hours after the first interview, but did not then make a confession. The third interview was conducted about three hours later prior to which no fresh *Miranda* warnings were given, but appellant having been advised of them twice before, he could not but have known of them. After the recording device failed to record appellant's confession given in the third interview, eight hours later he was given a new *Miranda* warning and repeated his confession. As in *Mosley,* these time intervals are significant. Nothing appears that appellant was in any way overreached or that he did not knowingly, intelligently and voluntarily give his confession.

■ Appellant contends that the court erred in not granting his application for change of venue, which was supported only by his own affidavit of prejudice of the inhabitants of Cole County, Missouri. That county is less than 75,000 inhabitants and Rule 30.04 requires as to it that the application be supported by five or more credible, disinterested persons residing in different neighborhoods of the county. Appellant having failed to present a sufficient number of affidavits, the court did not err in denying his application for change of venue. *State v. Denmon,* 473 S.W.2d 741, 746[5, 6] (Mo.1971).

The judgment is affirmed.

All concur.