STATE of Missouri, Respondent,

v.

Leon GARNER, Appellant.

No. 15498.

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 10, 1988.

Motion for Rehearing or Transfer to Supreme Court Denied Dec. 5, 1988.

Robert D. Rachlin, Gary H. Barnes, Downs Rachlin & Martin, Burlington, Vt., and Lew Kollias, Columbia, for appellant.

William L. Webster, Atty. Gen., Elizabeth Levin Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

A jury found Leon Garner ("appellant") guilty of the class A felony of murder in the first degree, § 565.020, RSMo 1986, and assessed punishment at imprisonment for life without eligibility for probation or parole. The trial court entered judgment per the verdict. This appeal followed.

Appellant briefs two points. The first avers the trial court erred in denying appellant's motion to suppress a written statement and a videotape statement in which appellant implicated himself in the murder. The second asserts the prosecutor improperly argued to the jury that appellant should be convicted "as a response to rampant crime in society." We synopsize only the evidence necessary to adjudicate those points.

The victim was Steve Swofford, a 20–year–old male. About 10:30 p.m., February 4, 1986, Swofford arrived alone, on foot, at the home of Allan Lee Mills and the latter's wife, Laverne, 410 West 13th Street, in Caruthersville. Swofford remained there until shortly before 1:00 a.m., February 5, when he departed on foot going east, a direction that would have taken him toward his sister's residence, the Central Gardens Apartments several blocks distant. Between 1:45 and 2:30 a.m., an acquaintance of Swofford's, John T. Hayes, saw Swofford at the corner of 14th Street and Walker Avenue walking south toward Central Gardens Apartments, a block and a half away.[1] Hayes, who was in an automobile bound for an apartment in the same complex, offered Swofford a ride but Swofford declined.

At 6:54 a.m., the same day Sergeant Steven R. Evetts of the Caruthersville police department observed Swofford's body in a "grass area" on the east side of Davis

---

1. We glean from the record that in Caruthersville the numbered streets run generally east and west, while the named streets run generally north and south.

Avenue 27 feet from the corner of Davis Avenue and 14th Street. Evetts testified Swofford was "laying with his feet west and his head east, and very very bloody; he had wounds to neck, face and chest." Evetts checked Swofford for signs of life, but found none.

The coroner of Pemiscot County was called to the scene. He observed "stab wounds" on Swofford's chest and neck. The coroner testified: "The main or largest wound in the chest was in the upper left part of the chest, which was about an inch wide, long. Then it had two smaller ones in the lower part of the chest. Then he also had three wounds in the neck; one of them was a fairly size wound; the other two was just superficial." The coroner also saw "head wounds." He testified: "The frontal part of the head was beaten very badly; brain tissue was all over the area where his head was lying, was on his clothing, and his skull was bursted in several places." Furthermore, recalled the coroner, "[T]here was a place around his neck that could of been caused by some object being tied around his neck; also there is ... a thorough cut above his eye that was made with an instrument, and above on his forehead, a jaggard [sic], looked like it would of been made with a hunting knife or something of that type." The coroner, after consultation with a physician who examined the body later at a hospital, concluded that the cause of Swofford's death was "the stab wound in the chest." The coroner added, however, that the head wounds, alone, would have caused death. In the coroner's opinion death occurred between 1:00 and 3:00 a.m.

Appellant was picked up by Caruthersville police for questioning about the homicide on two separate occasions. The first, according to appellant, was around February 13, 1986. Appellant recalled he was held some four hours, then released. The second instance, said appellant, was four days later. On that occasion appellant was released after "less than [an] hour."

On February 21 or 22, 1986, Bobby Walter Hatton, a parolee with convictions for rape and burglary, gave Caruthersville police a statement implicating appellant and Lemon C. Samuels in the Swofford homicide.

Testifying at appellant's trial as a prosecution witness, Hatton recounted that on the evening of February 4, 1986, he, appellant and Samuels were at the Iceberg Club in Caruthersville. After midnight, according to Hatton, he, appellant and Samuels were standing in a parking area by a sign pole in front of the Club "just shootin' the breeze over old times." Samuels, according to Hatton, was carrying a dagger. Hatton explained that Vest Avenue runs in front of the Club, which sits in the block between 12th and 13th Streets. The numbered street nearest the sign pole is 13th. Testimony of another witness indicated that the front of the Club faces "generally east," from which we infer that the Club sits on the west side of Vest Avenue. As we comprehend Hatton's testimony the next street west of, and parallel to, Vest Avenue is Davis Avenue.

Asked what occurred while he, appellant and Samuels were conversing outside the Club, Hatton replied that Samuels mentioned he needed money and wanted to break in something. Then, said Hatton, Samuels saw someone walking on Davis Avenue toward Central Gardens Apartments. Samuels, according to Hatton, asked the pedestrian, "Hey, Man, give me a light," and began walking toward him, followed by appellant. When Samuels and appellant reached the pedestrian they grabbed him and carried him to an alley by the Club.

Then, said Hatton: "[T]hey, when they brought 'im around to the side of the buildin' Lemon C. picked up a stone or a brick or somethin' from the ground and hit the boy up side the head with it. Leon slung 'im up against the buildin' and he fell." Asked what occurred next, Hatton replied: "They went to kickin' the boy.... They was kickin' 'im all over the body, you know, I wasn't lookin' at, you know, the specific place or anything, they were just

kickin' 'im." Then, said Hatton, "I seen Leon pull a hammer out from underneath his belt and hit the boy in the head with it." Next, according to Hatton, Samuels stabbed the victim with the dagger. Hatton was unable to say how many times.

At that point, Samuels and appellant ceased the attack and looked at Hatton. Hatton began running, pursued by Samuels and appellant. Hatton eluded the duo by concealing himself behind "some hedges." Hatton heard Samuels say, "We got to get some more clothes." Hatton trailed Samuels and appellant to the latter's residence on Vest Avenue "right across from the Iceberg." Samuels and appellant entered the house, emerging a few minutes later. Hatton noticed that Samuels had changed clothes and was carrying a bag. Samuels and appellant, trailed by Hatton, returned to the scene of the attack where Samuels told appellant, "Look in ... the Dude's pocket, Man, see if he got somethin'.'" Then, according to Hatton, Samuels and appellant searched the victim's pockets. At that point, said Hatton, "I went home."

Hatton's statement to the police on February 21 or 22, 1986, coincided with his trial testimony, summarized above. Until Hatton's disclosures the police were unaware that the fatal assault had occurred by the Iceberg Club. The attack site, according to a Caruthersville police lieutenant, is 575 feet northeast of the place where Swofford's body was found.

Acting on the information from Hatton, Caruthersville police including Lieutenant Raymond Best and Officer Gary Hilburn arrested appellant in Caruthersville around 7:00 to 7:30 p.m., February 22, 1986, taking him to city hall. Appellant was kept there a few minutes, then he was taken to Hayti, some five miles away, by Assistant Chief Harold Mansfield and Officer James Mills of the Caruthersville police department. At Hayti appellant was placed in the Hayti city jail. The purpose of taking him there,

according to Officer Hilburn, was to keep appellant separated from Samuels, who was in custody at the Caruthersville city jail, and from Hatton, who was in "protective custody" at the same facility. The events of the next 30 hours supply the basis for appellant's contention that his incriminatory statements should have been suppressed. We summarize appellant's testimony regarding those events, noting that appellant testified twice about them. The first instance was during a pretrial hearing; the second was at trial.

At the pretrial hearing appellant testified that at the time of his arrest (which he estimated as 5:30 p.m.) he was handcuffed and pushed into a police car, bumping his head on the door. Appellant conceded that at the scene of the arrest an officer advised him of his "Miranda" rights.[2] At the Caruthersville city jail, according to appellant, his cap was "snatched off" his head and he was "pushed down in a chair" by Officer Mills. His cigarettes and other "personals" were taken from him. Then, said appellant, he was "snatched back up" and taken to Hayti.

Appellant testified that at the Hayti city jail he was told by Officer Mills to get out of his clothes. Appellant's testimony at the preliminary hearing, coupled with his testimony at trial, establishes he was wearing "a long army coat," a sweater, a blue shirt, a tee shirt, a pair of "painter's jeans," a pair of corduroy slacks, socks and shoes. Mills took appellant's coat, sweater, painter's slacks, socks and shoe laces.

Additionally, said appellant, Mills took appellant's rings and a "leg chain." Appellant recalled that Mills snatched the chain, "almost pullin' me down." Then, said appellant, Mills began questioning him about the murder. Asked whether he was ever threatened, appellant replied that Mills "told me that he would knock my teeth out, knock me through the wall, knock me out of a chair." At trial, appellant quoted Mills

---

**2.** Presumably the litany required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

as saying appellant was acting "like a cotton patch nigger."

Appellant testified he asked Officer Mills for an attorney. According to appellant, Mills replied he would see what he could do.

Appellant recalled the questioning lasted 15 to 20 minutes, during which he denied any knowledge of the murder. Then, said appellant, Mills took him downstairs to a cell. Appellant testified that en route Mills said, "If you stumble I will knock your black ass out." Appellant was placed in a cell "which was very cold, no window, just cardboard over it."

The next morning, said appellant, Mills returned and took him upstairs, offering coffee and a cigarette, which appellant accepted. Then, according to appellant, Mills said, "Now, you and Lemon C. killed the boy." As we understand appellant's testimony, at some point during this encounter with Mills appellant asked for an attorney. Mills, according to appellant, said he would see what he could do. Appellant denied any knowledge of the killing. Appellant testified Mills responded to the denial by saying, "Well, I'll knock your black ass through that wall." Mills then returned appellant to his cell, again threatening to "knock your black ass out" if appellant stumbled.

Appellant recounted that during the afternoon of February 23 he was fed "two small hamburgers and a Coke," his first food since his arrest. Appellant quoted the officers who brought it as asking why he did not tell the authorities what they wanted to know. Appellant testified he replied he did not know anything and was willing to take a polygraph test to prove his innocence.

About 5:30 p.m., according to appellant, Lieutenant Best and Officer Hilburn came to his cell and Best asked whether appellant had said he would take a polygraph test. Appellant responded he had. Then, said appellant, Hilburn stated: "Boy, I'll kill you. Keep that damm [sic] mouth

closed all the way there, do you hear me, do you understand me?" Appellant replied, "Yes, sir."

Best and Hilburn then placed appellant in a police vehicle to go to Poplar Bluff for a polygraph test. Before leaving Hayti they stopped at a store and bought appellant a barbecue sandwich, a bag of potato chips and a Coca–Cola. Appellant testified he ate the sandwich and drank the beverage, but left the chips in the car.

Appellant conceded at trial that after leaving the Hayti city jail neither Best nor Hilburn threatened him during the journey to Poplar Bluff, nor did they question him.

Before summarizing appellant's testimony regarding events at Poplar Bluff it is helpful to take note of the State's evidence regarding appellant's motion to suppress. The prosecutor presented two witnesses at the pretrial hearing, Hilburn and Sergeant Donnie Wayne Smith of the Missouri State Highway Patrol.

Hilburn testified he and Best picked appellant up at the Hayti city jail around 2:00 p.m., February 23, for the trip to Poplar Bluff. Hilburn confirmed that food was purchased for appellant at a "fast food store" before leaving Hayti. At trial Hilburn recounted that when he opened the back door of the patrol car to hand appellant the food appellant "swung his legs out." Hilburn testified, "[H]e made a move, it was kinda [sic] fast, and I told 'im, I warned 'im, that if he attempted to escape I would shoot 'im."

The trio arrived at the headquarters of Troop E, Missouri State Highway Patrol, at Poplar Bluff, about 3:45 or 4:00 p.m., where appellant was placed in a "holding room." According to Hilburn, Sergeant Smith began talking to appellant about 5:00 p.m. The interview took place in the "polygraph room." Hilburn recalled that Smith advised appellant "of his rights" at the outset of the interview. During the interview, said Hilburn, appellant was given water and coffee.

Smith testified he began his interview with appellant about 5:50 p.m. Smith and

appellant were the only ones in the polygraph room; however, Best and Hilburn observed the interview through a "one-way mirror." Smith endeavored to determine whether appellant was "suitable to a polygraph test" by asking "certain questions about [his] medical history and things like that." Smith added that he asked appellant how much sleep he had gotten in the last 24 hours. Smith quoted appellant as saying he "went to bed at 5:30 p.m. and got up at daylight, and he slept fine." Smith also asked appellant about the crime; appellant denied it. Smith administered a polygraph test to appellant. When the test was completed Smith had been with appellant "almost exactly three hours."

Smith took the polygraph charts into his office, examined them and scored them, and came to the conclusion that appellant "was lying to the relevant questions." During that time appellant remained alone.

Smith discussed the test results with Best and Hilburn, then Smith returned to the polygraph room about 10:00 p.m., and commenced an interrogation of appellant. Smith's testimony at the pretrial hearing, read in conjunction with his testimony at trial, establishes that at the outset of the interview he gave appellant the "Miranda Warnings."

Smith's interrogation of appellant lasted "about three hours," during which appellant confessed "orally" to Smith. Smith recalled that when appellant completed his oral statement "we took a short break." Smith explained, "I went and got a cup of coffee, and I got him coffee or whatever kind of a drink he asked for." Then Best and Hilburn took a written statement from appellant.

At the pretrial hearing Hilburn identified a one-page document captioned "VOLUNTARY STATEMENT." It is dated "2–24–86" at 1:18 a.m. It states:

"I ... Leon Garner, am 29 years of age, my date ... of birth being the 6 day of Dec 1956....

Before answering any questions or making any statements, Gary Hilburn, a person who identified himself as a Caruthersville Police Officer, duly warned and advised me, and I know and understand that I have the following rights: That I have the right to remain silent and I do not have to answer any questions or make any statements at all; that any statement I make can and will be used against me in a court or courts of law for the offense or offenses concerning which the following statement is hereinafter made; that I have the right to consult with a lawyer of my own choice before or at anytime during any questioning or statements I make; that if I cannot afford to hire a lawyer, I may request and have a lawyer appointed for me by the proper authority, before or at anytime during any questioning or statements that I make, without cost or expense to me; that I can stop answering any questions or making any statements at any time that I choose, and call for the presence of a lawyer to advise me before continuing any more questioning or making any more statements, whether or not I have already answered some questions or made some statements.

I do not want to talk to a lawyer, and I hereby knowingly and purposely waive my right to remain silent, and my right to have a lawyer present while I make the following statement to the aforesaid person, knowing that I have the right and privilege to terminate any interview at any time hereafter and have a lawyer present with me before answering any more questions or making any more statements, if I choose to do so.

I declare that the following voluntary statement is made of my own free will without promise of hope or reward, without fear or threat of physical harm, without coercion, favor or offer of favor, without leniency or offer of leniency, by any person or person whomsoever.

I Leon Garner & Lemon Sander & Bobby Hatton was together on Feb 5–86 on 13th Vest went one white male came south on Davis & Lemon & myself come fronted the man about some money At this we

took him behind the Iceberg Culb [sic] At that Lemon hit the man with a brick I let him go too [sic] the ground & stick him three or four time. I drunk not knowing what I was doing I think I hit him with a hammer Lemon has a knife and stabbed the man how many times I don't know Bobby Hatton asked Lemon too [sic] stop but Lemon got mad at him and said this is for your black ass & Bobby ran I told Lemon too [sic] stop but he ran after Bobby. Bobby got away. Lemon chaged [sic] pants & put the blood one in a bag where they are I don't know I don't know what was taking [sic] off the body. Lemon put the body by a tree on 14th & Davis pull by the hands.

I have read ... this statement ... and I certify that the facts ... herein are true and correct. I further certify that I made no request for the advice or presence of a lawyer before or during any part of this statement, nor at any time before it was finished did I request that this statement be stopped. I also declare that I was not told or prompted what to say in this statement.

This statement was completed at 2:08 A.M. on the 24 day of Feb, 1986.

Witness: s/ Lt Raymond Best

Witness: s/ Gary L. Hilburn # 29 s/ Leon Garner"

Hilburn recounted that after appellant signed the above statement a "videotape statement" was taken from him. Hilburn operated the camera; Smith interviewed appellant. Asked when this was done, Hilburn replied, "[P]robably after 2:00, because Sgt. Smith had some trouble gettin' the t.v. set up and ready with the v.c.r. and everything."

The videotape statement, which we have viewed, began at 2:23 a.m., and ended at 2:38 a.m. In it, appellant and Smith are seated at a table facing the camera, appellant to Smith's right. At the beginning Smith advises appellant of the rights required by *Miranda v. Arizona.*[3] Appellant acknowledges he understands his rights and that he desires to talk about the homicide. Appellant's version of the incident on the videotape corresponds to his written statement except that where the written statement says appellant "stick him three or four time" appellant states on videotape that he *kicked* the victim three or four times. Appellant also reveals on videotape that Samuels changed pants at appellant's apartment, putting the bloody pants in a brown paper grocery sack. Appellant explains on videotape that Samuels left the bag by the Iceberg Club while he (Samuels) drug the victim's body to the place where it was found. Then Samuels returned to the Iceberg Club, picked up the bag and departed. Appellant went to his girl friend's residence but she was not there so appellant returned home.

Appellant, testifying at the pretrial hearing, recalled Sergeant Smith saying after the polygraph examination that the machine was not lying and that he (appellant) was lying. Appellant maintained Smith and Best told him what to put on the written statement. Appellant conceded that the only two times he requested an attorney after his arrest were the occasions on which he asked Officer Mills. Appellant's version of those incidents has previously been synopsized.

Asked why he signed the written statement and gave the videotape statement, appellant answered, "Due to death threats on my life." Appellant admitted Best never threatened to kill him, but insisted Hilburn had. The threat to which appellant was referring was the one he said Hilburn had made at appellant's cell in Hayti.

Appellant acknowledged he had a felony conviction for assault and "about six" misdemeanor convictions. He conceded he was furnished water, cigarettes and coffee at Poplar Bluff. He added that he never requested food there, as he was not hungry. At trial appellant was asked how much sleep he got between the time of his arrest and the time he signed the written

**3.** Footnote 2, *supra.*

statement. He answered, "I doubt if I even got five or six hours of sleep."

Appellant's motion to suppress the written statement and the videotape statement alleged, among other things, that the statements were involuntary due to the length and nature of appellant's custody, the nature and duration of his interrogation, and the conditions under which it was conducted. The motion further alleged appellant was subjected to mental, physical and psychological duress during interrogation, and that the statements were taken in violation of his right to counsel in that he indicated he did not wish to waive his right to remain silent or his right to counsel or his right to have counsel appointed for him. Furthermore, pled the motion, the officers did not cease interrogation when appellant indicated he desired to have appointed counsel present on his behalf at interrogation.

The prosecution did not present Officer Mills as a witness at the pretrial hearing on appellant's motion to suppress, even though Mills was the only officer to whom appellant had allegedly made a request for counsel. The prosecution did, however, call Mills in rebuttal at appellant's trial.[4] Mills denied threatening to kill appellant and denied threatening to knock appellant down any stairs. Mills also denied that appellant ever asked him for a lawyer or that appellant ever gave any indication he might like an attorney. According to Mills, the only threat he ever made to appellant was on arrival at the Hayti city jail. Mills explained: "He emptied his pockets out on the desk. I hadn't even had time to take inventory yet. I set down on one side 'n he set down on the other side, and he just reached straight across sudden like and I grabbed his arm, and I did tell 'im I'd knock his teeth out if he did it again.... I did not know if he was reachin' for me or reachin' for somethin' on the desk."

At the conclusion of the pretrial hearing on appellant's motion to suppress the trial

court stated: "I'm going to find that the confessions were voluntary, and I will receive them on that basis, and [the written statement] and [the videotape statement] will be received. And the Motion to Suppress is overruled, subject to my changing my mind if you come up with some law."

On the morning of trial, prior to voir dire of the jury panel, appellant, through counsel, asked the trial court to reconsider its ruling on the motion to suppress, "considering not only the voluntariness of those particular statements, but also any due process rights that were violated in the taking of those particular statements." Additionally, appellant's counsel asked the trial court to suppress the videotape statement on the further ground that the quality of the tape was such that appellant's "facial mannerisms" could not be seen. The trial court stated it would view the videotape before it was offered.

Prior to the parties' opening statements the trial court viewed the videotape, after which the trial court stated: "Let the record show that the Court has observed the videotape confession, does find that it was voluntary, and the Court does further find that the videotape recording was at least of reasonable clarity and it did appear to the court that it was of good clarity."

When appellant's written statement was offered in evidence by the prosecutor, appellant's counsel objected on the grounds previously advanced and reminded the trial court that appellant's testimony that he had twice asked Officer Mills for a lawyer was undisputed (Mills' testimony on that subject came during the prosecution's rebuttal evidence) and that appellant was never furnished a lawyer. The objection was overruled, and the prosecutor read appellant's written statement to the jury.

Later the prosecutor offered the videotape statement in evidence. Appellant, through counsel, reiterated all objections previously made. They were overruled and

4. Mills' testimony revealed he was no longer a Caruthersville police officer, as he had moved to Springfield and become pastor of a church. It

is thus inferable he was not readily available to testify at the hearing on appellant's motion to suppress, which took place six days before trial.

the jury was permitted to view the videotape.

During the prosecutor's final argument to the jury he made three comments which supply the basis for appellant's second point, which we shall dispose of before returning to appellant's first point. Near the end of the *opening* segment of his argument the prosecutor said:

"And we've got a danger in our society today, ladies and gentlemen, and that danger is not convicting innocent people. That danger is letting the guilty go unpunished, and the end result being that crime is rampant."

Appellant voiced no objection to the above comment.

Near the end of the *closing* segment of the prosecutor's argument we find this:

"Ladies and gentlemen, a lot of times we read in the paper, watch t.v., hear on the radio about some horribly violent crime that has occurred. We all know there's an epidemic of crime in our country—

[Appellant's counsel]: Your Honor, we're going to object to arguments based upon epidemics of crime, I believe that, that is an improper appeal to the jury.

The Court: Overruled.

[Prosecutor]: We've all heard about it, we all know that, that's common knowledge. How many times have you heard about something happenin', something bad happening like this, and thought to yourself, well, why doesn't somebody do somethin' about it."

In his motion for new trial appellant assigned error in the trial court's overruling of the objection appearing in the above passage from the transcript.

Although the only objection at trial was the one quoted above, and although the motion for new trial referred only to that objection, appellant in his second point on appeal now attempts to assign error regarding all three of the prosecutor's comments. Additionally, appellant no longer indicts the *trial court* with error in over-

ruling the lone objection registered at trial. Instead, appellant's second point, as we comprehend it, endeavors to charge the *prosecutor* with error in making all three of the comments. Appellant's second point reads:

"The prosecutor's closing argument improperly suggested that the jurors should convict appellant as a response to rampant crime in society. The prosecutor's closing argument fatally conflicts with the presumption of innocence and the rationale underlying the prosecution's burden of proof beyond a reasonable doubt. The closing argument so violated appellant's fifth and fourteenth amendment rights to due process of law, and appellant's sixth amendment right to an impartial jury and to confront witnesses."

▮ The first flaw in the point is that only the objection at trial has been preserved for appellate review. Contemporaneous objection and proper request for relief are predicates to appellate review of matters arising from closing argument of counsel. *State v. Hayes*, 624 S.W.2d 16, 19–20[5] (Mo.1981); *State v. Martin*, 484 S.W.2d 179, 180[1] (Mo.1972). Consequently, appellant's complaint about the prosecutor's first and third comments could be considered, if at all, only if such comments amounted to plain error warranting relief under Rule 30.20, Missouri Rules of Criminal Procedure (19th ed. 1988). More importantly, however, it is clear that under existing Missouri law, as established by decisions of the Supreme Court of Missouri, there was no error, plain or otherwise, in any of the prosecutor's three comments. A prosecutor is permitted to argue such propositions as the prevalence of crime in the community, the personal safety of its inhabitants, and the jury's duty to uphold the law as well as inferences from its failure to convict, and such pleas may call upon common experience. *State v. Newlon*, 627 S.W.2d 606, 618–19[21] (Mo. banc 1982), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149, *reh'g denied*, 459 U.S. 1024,

103 S.Ct. 391, 74 L.Ed.2d 520 (1982); *State v. Olds,* 603 S.W.2d 501, 511[14] (Mo. banc 1980).

Appellant acknowledges the current state of Missouri law on this subject, but insists the facts of the instant case "suggest a need to reexamine prior rulings."

We are bound to follow the last controlling decision of the Supreme Court of Missouri. Mo. Const. art. V, § 2 (1945); *State v. Jones,* 703 S.W.2d 41, 42[1] (Mo.App. 1985); *Estate of Seabaugh,* 654 S.W.2d 948, 957[4] (Mo.App.1983). Accordingly, if there be a need to reexamine the rules articulated in *Newlon* and *Olds,* such task is for the Supreme Court of Missouri, not us. Appellant's second point is denied.

Returning now to appellant's first point we note that after the jury was discharged an incident occurred that profoundly affects our disposition of such point. The incident is described in the affidavits of Public Defender Gary L. Robbins and Assistant Public Defender Lance R. Drury of the Thirty-second Judicial Circuit, appended to appellant's motion for new trial.

Robbins' affidavit states, in pertinent part:

"On October 1, 1987 I was present during a conversation that took place in the New Madrid county courtroom ... shortly after the jury had reached a decision of guilty in ... State of Missouri v. Leon Garner.... Present during the conversation were Circuit Judge Eugene Reeves, Assistant Public Defender Lance R. Drury, and myself....

In my opinion it was obvious that Mr. Drury was very 'down' as the jury had just found his client ... guilty of first degree murder. It is also my opinion that in an effort to console Mr. Drury, and possibly me, Judge Reeves informed Mr. Drury that he should not concern himself with Leon Garner's guilt, that he had received information that confirmed Garner's involvement in the death of Steve Swafford.

I am not able to recall if, or whether Judge Reeves stated where, when or from whom he received whatever information prompted his comment."

Drury's affidavit states, in pertinent part:

"Shortly after the jury was discharged in ... State of Missouri v. Leon Garner ... in the New Madrid county circuit courtroom on October 1, 1987, Gary Robbins, Judge Reeves and I were present. Judge Reeves approached Mr. Robbins and me and stated to me that I shouldn't lose any sleep or my conscience shouldn't bother me that an innocent man had been found guilty because he had some information that Leon Garner was, in fact, guilty. The Judge did not reveal the source of his information nor did he indicate when he obtained this information. This occurred maybe fifteen to twenty minutes after the jury was discharged. Judge Reeves did indicate that he knew people in the black community and that one of those persons had given him information which led him to believe that Leon Garner was the murderer of Steve Swafford. The conversation took about five minutes. It is possible that the Judge may have stated that this person knew members in the Evelyn Hill household who knew that Leon Garner was not at home that night, but I cannot recall the exact particulars."

The final point in appellant's motion for new trial averred the trial court erred "in failing to remove itself for cause as the judge in the [instant] matter on the grounds that the trial court had ex parte communication with an individual in the community who had knowledge about the case which would lend the appearance of impropriety to the trial since the court was required to make decisions concerning the credibility of the [appellant] during the hearing on the motion to suppress and during the trial." The motion added, "The failure of the court to recuse itself because of such independent knowledge proved prejudicial to the [appellant] in that it gave an appearance of impropriety to the ... trial."

The trial court, in a "Response" to the above point, stated:

"... The ... point ... seems to be that if the Court had formed a belief as to the guilt of the defendant prior to commencement of the trial that the Court on its own motion should have disqualified.... Although the Court believes that it gave no attention to the guilt or innocence of the defendant before trial, the Court will decide this by facing the point asserted by defendant, that is, that if the Court forms a belief as to the guilt or innocence of the defendant before trial, it must disqualify on its own Motion.

Judges are often aware of rumors, circumstances, plea negotiations and other matters which are never known to the jury. Such extraneous information may cause the Court to form an unstructured non-deliberative belief that the defendant is either guilty or innocent prior to or during the trial. Such casual beliefs formed without applying a deliberative process and burden of proof standards, do not in this Court's opinion interfere with the Court's discharge of its judicial responsibility. When the Court considers evidence and matters of law such casually formed beliefs are set aside and rules of law applied.

In earlier years, this defendant appeared before this Court in the Associate Division of Pemiscot County and on conviction on more than one occasion of criminal charges, was sentenced to jail. This was known to defendant when a Change of Venue was taken from Pemiscot County and this Court was not disqualified. The Court was also aware of plea bargaining which preceeded [sic] the trial and on several occasions had heard casual remarks about the case. Such off-the-record knowledge did not and could not influence the Court in reaching any decision prior to trial or during the trial.

....

In many cases, inadmissible matters may come to the attention of the judge and in fact, defense counsel, which may cause the judge or defense counsel to have an opinion or belief concerning defendant's guilt. However, the judge and defense counsel in fulfilling their responsibility under our system of justice are duty bound to discharge their responsibilities aside from such beliefs.

Having heard the evidence in the case and other matters since the trial, such as knowledge of the plea of guilty to murder by Lemon Samuels, defendant's alleged companion of the evening, the Court is still duty bound in passing on this Motion for New Trial to objectively consider the Motion. This Court is fully satisfied that it can do so."

The trial court denied appellant's motion for new trial.

Appellant's first point is:

"The trial court erred in denying appellant's motion to suppress. The undisputed evidence at the suppression hearing established that appellant requested a lawyer, that his request was not honored, and that law enforcement authorities thereafter initiated interrogation. Further, the unrebutted evidence at the suppression hearing shows that appellant did not voluntarily confess to the crime, but was coerced into confessing. The trial court denied the motion to suppress without making any findings, and later, after conviction, made an off-the-record comment to the effect that the court had obtained information on its own, undisclosed to counsel, which convinced the court of appellant's guilt. The fifth, sixth, and fourteenth amendments of the United States Constitution require that all evidence of the confession be suppressed. At a minimum, appellant should be afforded a full and fair suppression hearing, free from the taint that matters outside of the record and undisclosed to counsel may have been considered."

The general rules pertinent to appellant's first point are set forth in *State v. Hunter*, 456 S.W.2d 314, 316[3–5] (Mo.1970):

"When the voluntary character of a confession is challenged ... it is the duty of the trial court to conduct a preliminary hearing outside the hearing of the jury to determine whether the confession is admissible in evidence, that is, whether it was free of inducement and was voluntarily given.... The court hears the evidence on the mixed question of law and fact and weighs the evidence.... If the evidence shows that the confession is voluntary the trial court admits the confession in evidence, first making the finding of voluntariness in accordance with the rule of *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 and *Sims v. State of Georgia*, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593, as set forth in *State v. Glenn* ... 429 S.W.2d [at] 237[29]. If the evidence shows that the confession is involuntary the trial court must exclude the confession. The burden of proof of voluntariness is upon the State when the confession is obtained while the suspect is in custody." [5]

*State v. Glenn*, 429 S.W.2d 225 (Mo. banc 1968), referred to in the above passage from *Hunter*, emphasizes that while a trial judge determining the issue of voluntariness need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity. *Id.* at 237.

▮ In the instant case sundry issues of fact were raised by appellant's motion to suppress and the testimony regarding it. Those issues included, among others, whether appellant was confined in a cold cell with inadequate clothing the night of his arrest, whether the conditions of appellant's confinement made it impossible for him to sleep, whether appellant was denied food until late in the afternoon of the day following his arrest, whether appellant was threatened with bodily harm or death by officers having custody of him, whether any of the officers manifested racial hostility toward appellant, whether appellant told Officer Mills he wanted a lawyer, whether appellant was questioned after he had requested counsel and, if so, whether appellant's statement to his jailers that he was willing to take a polygraph test to prove his innocence constituted an invitation by appellant for further communication with the police (see *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85[4], 68 L.Ed.2d 378, 386[4], *reh'g denied*, 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981)), whether appellant's written statement and videotape statement were involuntary, i.e., whether under the totality of the circumstances appellant was deprived of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that his will was overborne at the time he confessed (see *State v. Lytle*, 715 S.W. 2d 910, 915[5] (Mo. banc 1986)), and whether appellant's incriminating statements were obtained in violation of the *Miranda* [6] requirements.

The trial court, as we have seen, found only that appellant's confessions were voluntary. While that finding might have arguably been sufficient in other circumstances, see *Lytle*, 715 S.W.2d at 915-17, such is not the case here where one of appellant's contentions in the trial court was that he twice asked Officer Mills for a lawyer, that no lawyer was provided, and that the subsequent questioning which produced the confessions was carried on in the absence of counsel. Nowhere in the record have we discovered a finding by the trial

---

5. *Hunter*, 456 S.W.2d at 316[5], held that the State meets its burden of proof on the issue of voluntariness by presenting a prima facie showing of voluntariness, and that the controlling standard applicable in the making of that determination is whether the evidence *conclusively* shows that the confession is *involuntary*. That standard was replaced by a new standard in *State v. Olds*, 569 S.W.2d 745, 751-52[4] (Mo.

banc 1978), which held that the burden is on the State to prove by a preponderance of the evidence that there was compliance with the guidelines in *Miranda v. Arizona* (footnote 2, *supra*) and that the confession was voluntary.

6. Footnote 2, *supra*.

court as to whether appellant did or did not ask Mills for a lawyer on either of the occasions testified to by appellant.

The instant case is remarkably similar to *State v. Olds*, 569 S.W.2d 745 (Mo. banc 1978). There the accused testified at a pretrial suppression hearing that he repeatedly told the police who interrogated him that he wanted a lawyer but his requests were ignored. The accused ultimately gave his interrogators an oral confession. The prosecutor presented no evidence at the suppression hearing contradicting the accused's testimony. At the conclusion of the hearing the trial court overruled the motion to suppress, making no factual findings. During trial further evidence regarding the admissibility of the confession was heard, but again the prosecutor adduced no evidence refuting the accused's testimony that the confession came after his requests for a lawyer had been disregarded. The trial court found that the confession was made after the accused had been warned of his Miranda rights, that the confession was voluntarily made and that it was not the result of any force or duress. The Supreme Court of Missouri held that in the absence of a finding by the trial court that it disbelieved the accused's testimony regarding requests for an attorney and to remain silent, the Supreme Court could not find that the record supported the trial court's finding that the accused's waiver of his Miranda rights and his oral confession were voluntary. *Id.* at 751. The Supreme Court emphasized that the only evidence on the subject was the accused's unrefuted testimony which stood contrary to such a conclusion. *Id.* While the trial judge was free to disbelieve the accused and find his testimony incredible, the trial judge made no finding to that effect and the prosecution made no effort by any witness to refute the accused's testimony. *Id.* The conviction was reversed and the cause was remanded for a new trial.

In *State v. Alewine*, 474 S.W.2d 848 (Mo. 1971), decided seven years earlier than *Olds*, the Supreme Court of Missouri stated that when an accused, in support of a motion to suppress his confession, testifies that he stated a desire to remain silent and demanded an attorney, the trial court must make a factual determination resolving the issue, and the evidence must be sufficient to support the finding adverse to the accused in order for the confession to be admissible in evidence. *Alewine*, 474 S.W.2d at 852[4]. The Supreme Court acknowledged that the credibility of the witnesses is for the trial court to determine. *Id.*

As the trial court in the instant case made no finding on the issue of whether appellant requested a lawyer prior to confessing, we are unable to adjudicate the contention advanced by appellant in the second sentence of his first point. That question of fact will have to be resolved before appellant's first point can be ruled.

█ In similar situations the Supreme Court of Missouri has held appeals in abeyance and ordered trial courts, upon notice to counsel, to allow argument (with the accused present) on unresolved issues regarding admissibility of confessions received in evidence at criminal trials, to consider the evidence of record and to make express findings on fact issues affecting admissibility, and to certify such findings to the Supreme Court. Upon receipt of the findings the Supreme Court has then resolved assignments of error regarding admissibility. *Glenn*, 429 S.W.2d at 237–38; *State v. Edwards*, 435 S.W.2d 1, 5 (Mo. 1968). In one such case the trial court heard evidence anew and made findings of fact on the basis of that evidence and the evidence of record from the trial. *State v. Bridges*, 491 S.W.2d 543, 545 (Mo.1973).

Such procedure would, in normal circumstances, be available here and, as Mills' testimony refuting appellant's testimony regarding the requests for counsel was ultimately presented as part of the prosecution's rebuttal evidence, the trial court would, absent the unique circumstances of the instant case, be in a position to make findings from the evidence of record resolv-

ing all of the fact issues affecting admissibility of appellant's written and videotape confessions.

However, in view of the affidavits of Public Defender Robbins and Assistant Public Defender Drury, which alleged facts unrefuted in the trial judge's "Response," we cannot ask that judge to resolve the fact issues necessary for appellate review of appellant's first point. That is because the resolution of those issues will require a determination of appellant's credibility and the credibility of the officers who had custody of, and questioned, appellant.

*State v. Green,* 613 S.W.2d 182, 183[3–5] (Mo.App.1981), explains that absolute impartiality, both in speech and conduct, is not only expected but is demanded of a trial judge. Conduct or speech of a trial judge indicative of a belief as to the accused's guilt is the antithesis of impartiality. Acts or conduct which give the appearance of partiality should be avoided with the same degree of zeal as acts or conduct which inexorably bespeak partiality.

As emphasized in *State v. Lovelady,* 691 S.W.2d 364, 365[1] (Mo.App.1985), the law is very jealous of the notion of an impartial arbiter. It is scarcely less important than his actual impartiality that the parties and the public have confidence in the impartiality of the arbiter. Where a judge's freedom from bias or his prejudgment of an issue is called into question, the inquiry is no longer whether he actually is prejudiced; the inquiry is whether an onlooker might on the basis of objective facts reasonably question whether he is so.

In the case before us the trial judge, responding to the affidavits of appellant's lawyers, professed impartiality and the ability to objectively decide all issues prior to and during appellant's trial. We do not question the trial judge's good faith in making that assertion. We cannot, however, ignore the possibility that the public

might reasonably question whether the trial judge is able to impartially decide the issue of appellant's credibility after having acknowledged receipt of information indicating appellant's guilt. Appellant testified at trial that he was with his girl friend at the home of her mother, Evelyn Hill, at the time the victim was killed. If appellant in fact be guilty, as the trial judge's information—whatever it was—apparently indicates, appellant's trial testimony was false. It would consequently be improper to require the trial judge to now resolve any issues hinging on appellant's credibility. We have therefore concluded that the fact issues necessary for adjudication of appellant's first point must be resolved by a different judge.

As the new judge will not have heard the testimony regarding the obtaining of appellant's written and videotape confessions, it will be necessary for the new judge to hear all evidence that appellant and the prosecutor desire to present on those issues unless, of course, the parties stipulate that the findings can be made on the basis of evidence already in the record.[7]

■ Furthermore, as it will be necessary for the judge who tried the case to recuse himself and request assignment of a new judge by the Supreme Court of Missouri, we have decided not to hold this appeal in abeyance pending receipt of the necessary findings, but rather to vacate the judgment —*not* the *verdict,* only the *judgment*—and remand the case to the circuit court for the procedure outlined above. *State v. Gower,* 418 S.W.2d 10, 14–15 (Mo.1967); *State v. Wise,* 745 S.W.2d 776, 780–82 (Mo.App. 1988).

■ If the new judge, upon making the factual findings necessary to resolve the issue of admissibility, rules that appellant's written and videotape confessions are admissible, the new judge shall sentence appellant in accordance with the ver-

---

7. That evidence includes appellant's testimony as to what occurred on the two occasions he was picked up for questioning prior to his arrest

on February 22, 1986, which evidence we have found unnecessary to summarize in this opinion.

dict and enter judgment accordingly.[8] Appellant can then appeal anew, but such appeal shall be confined to the issues raised by appellant's first point in the instant appeal, as we have already rejected appellant's second point and all other allegations of error in appellant's motion for new trial have been abandoned. *State v. Lay*, 427 S.W.2d 394, 403[12] (Mo.1968); *State v. Cunningham*, 380 S.W.2d 401, 402[1] (Mo. 1964).

An accused is denied due process of law if his conviction is founded, in whole or in part, upon an involuntary confession. *Lytle*, 715 S.W.2d at 915[1]. Accordingly, if the new judge, upon making the factual findings necessary to resolve the issue of admissibility, rules that appellant's written and videotape confessions are inadmissible, the new judge, subject to the proviso that follows, shall set aside the verdict and grant appellant a new trial.

We recognize that if the new judge holds appellant's confessions inadmissible the State may opt to attempt an appeal under § 547.200, RSMo 1986. It is unnecessary in the disposition of the instant appeal to decide whether the statute authorizes the State to do so, and we leave that issue unanswered, as it may not arise. It is sufficient for the instant appeal to provide that if the new judge rules the confessions inadmissible, the judge shall defer entry of the order setting aside the verdict until the time allowed the State to appeal under § 547.200 has expired. If the State takes an appeal, the new judge shall further delay entry of such order until the appeal has been decided.

The judgment is vacated and the cause is remanded to the Circuit Court of New Madrid County. The trial judge, Honorable Eugene E. Reeves, is directed to enter an order recusing himself from further action in this cause, and immediately upon entry of such order he is directed to request the Supreme Court of Missouri to transfer another judge to the Circuit Court of New Madrid County to carry out the tasks set forth in this opinion. Mo. Const. art. V, § 6 (1945, amended 1976). The new judge shall, as soon as reasonably possible thereafter, proceed in accordance with this opinion.

GREENE, J., concurs.

HOLSTEIN, C.J., concurs in part and dissents in part in separate opinion.

HOLSTEIN, Judge, concurring in part, dissenting in part.

I concur with the majority opinion vacating the judgment and ordering the cause remanded for a rehearing on the motion to suppress defendant's videotaped and written confessions and an entry of findings on that motion. However, I must respectfully dissent from this court's direction to the trial judge to recuse.

The only time the trial judge made factual findings which may have been tainted by ex parte communication was in his ruling on the motion to suppress prior to trial. From the record there is no showing as to when the communication took place. For all we know, it occurred after the trial commenced. If it did occur after trial had commenced, the duty to remain as judge in the case was at least as strong as the duty to recuse. *See Molasky v. State*, 710 S.W.2d 875, 878 (Mo.App.1986). A judge has an affirmative duty not to disqualify himself unnecessarily. *Cain v. Hershewe*, 760 S.W.2d 146, No. 15487 (Mo.App.1988).

There was no motion filed before the trial court asking Judge Reeves to recuse. The motion for new trial claimed error in the trial judge's failure to recuse on his own motion. That point was abandoned on appeal. The request for a new judge at a future suppression hearing was invented in

---

**8.** No lesser punishment than life imprisonment without eligibility for probation or parole is authorized. § 565.020, RSMo 1986.

the appellant's brief. Ordinarily a contention that a trial judge should have disqualified himself will not be considered on appeal in the absence of a request for such action in the trial court. *State v. Faber*, 499 S.W.2d 790, 793 (Mo.1973); *Novack v. Drey*, 668 S.W.2d 259, 260 (Mo.App.1984).

I know of only two situations in which appellate courts have held that on remand a trial judge must recuse where there has been no motion to disqualify in the trial court. The first situation is one in which the judge demonstrably prejudges a case prior to presentation of all the evidence. *Rutlader v. Rutlader*, 411 S.W.2d 826 (Mo. App.1967). The second situation is one in which the trial judge is shown to be prohibited from sitting in a case by reason of a specific relationship to one of the parties or to the case. *Grant v. State*, 700 S.W.2d 170 (Mo.App.1985); Rule 2, Canon 3C(1). Neither of those situations exists here.

A judge should not initiate or consider ex parte communication. Rule 2, Canon 3A(4). But the occurrence of ex parte communication is not one of those specific situations in which disqualification is mandatory. Disqualification resulting from ex parte communication is mandatory only if the ex parte communication results in bias or prejudice against a defendant. Rule 2, Canon 3C(1)(a). Applications to disqualify a judge for personal bias and prejudice against a defendant are addressed to the court's discretion. *City of Kansas City v. Wiley*, 697 S.W.2d 240, 244 (Mo.App.1985). We have no idea whether Judge Reeves would disqualify himself if presented with a motion to do so. A judge is entitled to a presumption that he will not undertake to preside in a hearing in which he cannot be impartial. *State v. Presley*, 694 S.W.2d 867, 869 (Mo. App.1985). I see no reason why we cannot presume that this trial judge will not disqualify in a subsequent proceeding in this case if in doing so he will remove any cloud of impropriety.

Apart from the failure to file factual findings on the motion to suppress, the trial was free from prejudicial error. Ab-

sent some showing that disqualification is mandatory or of actual bias and prejudice by the judge, appellate review of disqualification is viewed from the time of a motion, and only the proceedings that follow an improper ruling on a motion to disqualify are infected. *State v. Lovelady*, 691 S.W. 2d 364, 368 (Mo.App.1985). Here, in advance of any infection, the majority administers its remedy.

As I understand the majority holding, if on appeal we find error requiring further action by the trial court, and the record contains an unrefuted affidavit complaining of improper ex parte communication, this court will not only reverse the case but *sua sponte* disqualify the judge. The disqualification will be ordered even though there is no motion to disqualify, and there is no error associated with the alleged impropriety by the judge. Sound jurisprudence dictates judicial restraint, which in turn demands that the matter of disqualification on the basis of bias and prejudice be presented to the trial judge in the first instance.

I would merely reverse the case for a determination of the issues raised in the motion to suppress. To avoid another appeal on the same issue, I would caution the trial judge that as the record now stands the unrefuted allegations of ex parte communication, accompanied by the absence of detail in the judge's response regarding the time, source, and substance of the communication, give an appearance of impropriety. Therefore, if requested to do so, the trial judge should consider disqualifying and requesting assignment of another judge to rehear the motion to suppress and make the necessary findings.